# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

ARDRA YOUNG,

     Petitioner,                       CASE NO. 01-CV-10094-BC

v.                                 DISTRICT JUDGE DAVID M. LAWSON
                                 MAGISTRATE JUDGE CHARLES BINDER

PAUL RENICO,

     Respondent.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
## ON PETITION FOR WRIT OF HABEAS CORPUS

## I.    RECOMMENDATION

    For the reasons set forth below, **IT IS RECOMMENDED** that the petition for writ of habeas corpus be **DENIED**.

## II.    REPORT

### A.    Introduction

    Petitioner Ardra Young's *pro se* petition for a writ of habeas corpus was filed on March 15, 2001, presenting four arguments challenging his 1997 convictions by a jury of two counts of first-degree murder, Michigan Compiled Laws § 750.316, and two counts of felony-firearm, Michigan Compiled Laws § 750.227b. On November 19, 2002, the petition was denied and judgment entered for Respondent by U.S. District Judge David M. Lawson. (Dkts. 24 & 25.) On December 13, 2002, Petitioner filed a motion to alter the judgment pursuant to Rule 59(e). (Dkt.

28.)  Counsel was appointed to represent Petitioner.  (Dkt. 38.)  On July 9, 2003, Petitioner's motion was granted, and the case was referred to the undersigned Magistrate Judge for an evidentiary hearing on the sole issue of whether Petitioner's trial counsel provided constitutionally ineffective assistance when he failed to argue that Petitioner's confession was inadmissible on the grounds that it was the fruit of an illegal arrest.  (Dkt. 33.)  The hearing was held on November 10, 2003, and subsequent to receipt of the hearing transcript, counsel for both Petitioner and Respondent filed post-hearing briefs.  (Dkts. 50 & 51.)  Accordingly, the case is ready for Report and Recommendation.

### B. Factual Background

Petitioner's convictions arose out of the shooting deaths of his wife and son which occurred in February 1997 in Detroit, Michigan.  At that time, Petitioner was employed as a firefighter with the Detroit Fire Department, and he was also a partner in a fledgling truck business.  Late on the night of Saturday, February 8, 1997, a black Toyota was discovered on the side of the road in a secluded area of Detroit's Rouge Park.  One of the Toyota's back doors was open and one tire was flat.  (Trial Tr. of 10/28/97 at 73.)  Upon closer inspection of the vehicle, a passer-by discovered a female slumped over in the driver's seat and a young male in the back seat with his upper body slumped forward between the two front seats.  A substantial amount of blood was visible inside the car, the keys were in the ignition, and items including the victim's purse could be seen scattered about.  The police were summoned.  The female in the driver's seat was identified as 34-year-old Terry Young, Petitioner's wife.  She had been shot in the back of the head and was dead.  The 15-year-old boy was identified as Petitioner's son, Michael (Emanuel) Young.  He had also been shot in the back of the head, but was still alive and was transported to the hospital.  He died the following day after being removed from life support.

2

Petitioner was charged with both murders, and, following a five-day trial, a jury found Petitioner guilty of two counts of first-degree murder and two counts of using a firearm in the commission of a felony.  He was sentenced to concurrent terms of mandatory life imprisonment and to consecutive two-year terms for felony-firearm.

**C.      Law and Analysis**

**1.      Standard of Review**

Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claim on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has clarified that the phrase "clearly established Federal law, as determined by the Supreme Court of the United States," refers to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 1519, 146 L. Ed. 2d 389 (2000).  In determining what constitutes clearly established federal law, therefore, a federal habeas court must look to pertinent United States Supreme Court precedent.

The Court further explained in *Williams* that a state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at a different result.  *Id.*

at 405.  When reviewing the state court decision at issue, however, it is not a requirement that the opinion cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam).

In *Williams,* the Court instructed that a state court decision involves an "unreasonable application" of Supreme Court precedent under section 2254(d)(1) "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or if the state court either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context.  *Williams*, 529 U.S. at 407-08.

When engaging in habeas review, a federal court is required to presume the correctness of state court factual determinations.  28 U.S.C. § 2254(e)(1) ("a determination of a factual issue made by a State court shall be presumed to be correct").  A petitioner may rebut this presumption only with clear and convincing evidence.  *Id.*; *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

### 2.  Petitioner's Claim

As previously stated, this habeas case was referred on the sole issue of whether Petitioner's trial counsel provided constitutionally ineffective assistance when he failed to argue that Petitioner's confession was inadmissible on the grounds that it was the fruit of an illegal arrest. (Dkt. 33.)  Both facets of this issue, ineffective assistance of trial counsel and illegal arrest, were raised in the state courts and decided against Petitioner.  As this Court is required to presume the correctness of all state court factual determinations, 28 U.S.C. § 2254(e)(1), a review of the relevant state court proceedings and the evidence presented that impacted these issues is necessary.

4

### a. *Walker* **Hearing**

Prior to trial, Petitioner's counsel moved for suppression of a statement, signed by Petitioner, which he allegedly made to a Detroit Police Department investigator on the day after the shootings, wherein he confessed to the murders of his wife and son. Petitioner's counsel asserted that the confession should be excluded because it was coerced and therefore involuntarily given. *See Colorado v. Connelly*, 479 U.S. 157, 163-64, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions). Pursuant to *People v. Walker*, 374 Mich. 331, 132 N.W.2d 87 (1965), the trial court held a hearing on October 17 and 21, 1997, in Wayne County Circuit Court, to determine the admissibility of the confession.

At the *Walker* hearing, Homicide Investigator Isaiah Smith of the Detroit Police Department testified that Petitioner voluntarily came to the homicide department at around noon or 12:15 p.m. on Sunday, February 9, 1997, the day after the shootings. (*Walker* Hrng. Tr. of 10/17/97 at 7.) At 12:30, with Petitioner seated at Investigator Smith's desk in the squad room, Smith read Petitioner his rights and proceeded to ask questions regarding Petitioner's whereabouts at the time of the shootings. At some point during this exchange, Smith asked Petitioner if he owned a gun. Petitioner answered in the affirmative and told Investigator Smith that he was carrying one of his guns at that time. Sgt. Arlie Lovier, Smith's partner, was in the squad room at the time and overheard this exchange. Lovier went over to Smith's desk and asked Petitioner if, for safety reasons, he could hold onto the gun while Petitioner was in the police station. Petitioner voluntarily turned the gun over to Officer Lovier, who put it in his desk drawer. (*Id.* at 26.)

Investigator Smith testified that, as his discussion with Petitioner continued, he wrote down his questions as well as Petitioner's answers. At 2:45 p.m., the statement was complete, and

5

Petitioner signed each page.  At no time did Petitioner ask for an attorney.  (*Id.* at 13.)  Petitioner's statement indicated that he left the Detroit area on Friday evening, February 7, 1997, at approximately 7 p.m., and did not return to Detroit until Sunday morning, February 9.  The statement was presented to the judge in written form at the *Walker* hearing, and the main narrative portion of it (as it was read into the record at the subsequent trial) stated as follows:

> I went to Bolingbrook, Illinois, on a business deal to buy some trucks for my business.  [On Saturday,] I went to dinner with a salesman named John Malone who works for Arrow Truck Sales in Bolingbrook, Illinois.  Anyway, when dinner was over I became sick from the food I ate and returned to my motel room and passed out.  I woke about three a.m. this morning and decided to call home and check my voice mail.  When I called home there was a message on the voice mail telling me to call home from my brother, Mark Young.  I called my brother who lives with my parents and Mark told me that my wife, Terry, was gone, meaning she was dead, and that my son, Man-Man, was also gone.  I fell out on the bed and I asked Mark what happened and he replied, 'Just come home.'

> I hung up the phone and called my co-worker and business partner, Reginald Amos.  When I called, Reginald already knew and said that Sgt. Charlie Brown, my co-worker, had already told him about my wife being dead.  Reginald hooked me up on a three-way conversation between me, Charlie Brown and Reginald Amos.  Charlie was saying that Jason who works for EMS and out of the same ladder company had told him about the flat tire, jack, and what happened.

> I then hung up the phone and checked out [of] the motel.  I drove immediately to the hospital from Bolingbrook, Illinois.  I arrived at the hospital about ten a.m. and the doctors told me that my wife had expired and my son was on life support.  I immediately told the doctors to remove my son from life support and I signed the forms and they disconnected the life supports.  I then left the hospital and came directly to the Police Headquarters where the Detectives started to interview me.

(Trial Tr. of 10/29/97 at 30-31.)

Investigator Smith further testified at the *Walker* hearing that, after this statement was signed at approximately 2:45 p.m., he left the squad room to go talk to another officer and to make a phone call.  During this time, Petitioner remained seated at the desk.  Smith spoke with Sgt. Lovier, who told him what he had observed at the scene of the shootings.  This information was

helpful in terms of the investigation.  Smith also called the hospital and talked with the doctor caring for Petitioner's son, who told Smith about Petitioner's visit to the hospital that morning. (Walker Hrng. at 15-17.)

Investigator Smith testified that at around 3:15 p.m., armed with what he had learned, he re-read Petitioner his rights and then told Petitioner that he knew he was lying.  Specifically, Smith told Petitioner that he would "not walk out of there because the statement he gave me [before] was bullshit." (*Id.* at 29.)  Smith stated that at this point he considered Petitioner to be under arrest, but that prior to this point, Petitioner could have gotten up and walked out anytime – he had been left alone in an unlocked squad room, not an interrogation room, and when he had received a message on his pager from the hospital about his son, he had been allowed to call them right back.  (*Id.* at 27.)

Investigator Smith acknowledged on cross-examination that, as the second round of questioning began, he told Petitioner that he understood what Petitioner must have been going through, as he himself had once been in a similar situation with a girlfriend, and had had similar thoughts.  (*Id.* at 25.)  Smith denied, however, that he ever told Petitioner that, if he would confess, he would only get 10 years in prison and would be out at a young enough age to start his life over. (*Id.*)

Investigator Smith testified that Petitioner then confessed to shooting his wife and son and gave a second detailed statement which, like the first, was written down by Investigator Smith. The second statement was also read into the record at trial.  Near the beginning of the statement, Smith asked Petitioner, "Do you understand that you have been arrested for the fatal shooting of your wife, Terry Young, and your son, Michael Emanuel Young?", to which Petitioner answered, "Yes." (Trial Tr. of 10/29/97 at 43.)  The main narrative portion stated:

What I said to you earlier in the statement was the truth except I did come back to Detroit on Saturday night on February 8, 1997. I arrived in Detroit about nine-thirty p.m. and went to a do-it-yourself hand carwash and washed my car. I then went to a phone booth, called my wife, Terry, who was at home. I told her to come and meet me at West Outer Drive and Milford. About 10 minutes later Terry and Michael arrived in her car and she parked in back of me. I went back to their car and got my son out and sat him in my car. I then went back and got in the back seat on the passenger side of her vehicle. I then pulled a .38 caliber revolver, six-shot, I had taken from my father's house that was in my coat pocket. I cocked it and fired one shot into the back of her head as she sat behind the wheel of her car. The shot struck her in the back of her head and she slumped over in the front seat. . . .

I then got out of the car and called for my son to come back to the car and he did. I told him to get in the back seat and reach under the seat on his mother's side and I shot him in the head and he slumped down and I crawled over the front seat and got out the passenger front door and got back into the car and drove back to Bolingbrook, Illinois, to the motel I was staying at.

(*Id*. at 45-48.) The second statement also included Petitioner's answer to the question of what happened to the gun. Investigator Smith wrote down that Petitioner stated that when he came back to Detroit that morning, he went to his house and hid the gun in the attic. (*Id*. at 49.) Further, in response to Smith's inquiry as to why Petitioner shot his wife and son, he answered, "To be free. I couldn't do anything more for them." (*Id*.)

Investigator Smith further explained at the *Walker* hearing that, after the second statement was reviewed and signed, Petitioner was moved to an interrogation room and his brother Mark, a Detroit police officer, was allowed to spend time with him. (*Walker* Hrng. Tr. at 21.)

Sgt. Arlie Lovier also testified at the *Walker* hearing. Sgt. Lovier stated that he was in and out of the squad room while Petitioner was talking with Investigator Smith. (*Id*. at 38.) Lovier explained that he overheard Petitioner state that he was carrying a gun, and, upon request, Petitioner voluntarily turned the gun over to him for safe keeping. Sgt. Lovier stated that he unloaded the gun, locked it in his desk, and later that day placed it in evidence. (*Id*. at 39.) Lovier also testified that, prior to Petitioner's arrival at the homicide department, Lovier had gone to

8

Rouge Park to view the scene of the shootings, he had gone to inspect the vehicle that the bodies were found in, and he then spent the rest of the day making phone calls regarding the investigation and otherwise working the case. (*Id.* at 40.) Lovier stated that he knew who Petitioner's brother Mark was, although he didn't know him well, and that he saw the brother arrive around 4:30 or 5:00 that Sunday afternoon as he was leaving the building to go and have a search warrant application reviewed by a judge. (*Id.* at 41.)

Petitioner also testified at the *Walker* hearing. He stated that when he received word of what had happened, he was told to contact the Detroit Police Department, and so he called them from Bolingbrook, Illinois, at approximately 3:00 or 3:30 a.m., which would have been around 4:00 or 4:30 a.m. in Detroit. (*Id.* at 46.) He talked to an Officer Russell, who told him to come down to the homicide department after he got back to town, which he did. When he arrived at the police station around noon, another officer told him to sit in a little room, where he waited approximately 20 or 30 minutes before Investigator Smith arrived and took him to the squad room to talk.

Petitioner testified that Smith said he knew Petitioner's brother Mark really well, and that Smith and Sgt. Lovier entered into a discussion of a shootout that had involved Petitioner's brother. Petitioner testified that Smith told him that he was his friend and wanted to help him. (*Id.* at 49.) Petitioner further stated that Investigator Smith was "the perfect gentleman" during the entire first interview (*id.* at 59), that Smith and Lovier offered him food and a Coke several times (*id.* at 54), and that he thought he was just going to be able to walk out of there after they were done with the interview. (*Id.* at 66.)

Petitioner testified that after the first statement was complete, Investigator Smith left the room for about half an hour. When he came back, Petitioner told him that he had to leave, but

Smith said "just 10 more minutes," and then left the squad room again. (*Id.* at 50.) Petitioner claimed this happened at least three times. (*Id.* at 55.) Petitioner stated that, at one point, he even asked another officer to go and tell Smith to hurry up because he had a 3:00 appointment to meet with the funeral home director and needed to leave. (*Id.* at 50.)

When Smith finally came back, his entire demeanor had changed. Petitioner testified that Smith sat down right on top of his desk, leaned over into Petitioner's face, and said with a sarcastic grin, "I know that you're handing me a lot of bullshit." He went on to say that he knew Petitioner had not been intimate with his wife in a long time. (*Id.* at 54.) Petitioner testified that he asked Smith how he knew this, but Smith merely replied, "your walking out of here depends on whether you tell me what I want to hear or not." (*Id.*)

Petitioner testified that he was never advised of his constitutional rights by Smith or Lovier at any time that day, let alone twice. He admitted, however, that his signature and initials were on the acknowledgment of rights forms, as well as on the two statements, and gave the following explanation:

> A.    . . . once I made the phone call and the doctor confirmed that my son was dead . . . [w]ell, I fell apart. I fell completely apart. I started crying. I was all over the, I was all over the homicide room. I knocked a couple things off a desk and then it was at that point when I finally sat back down that Detective Smith hit me with this talk about my story being a lot of bullshit and that he knows things haven't been right between me and my wife for a long time and the rest and so from that point on, from the time that I reviewed that page, made contact with the doctor, found out what happened, I could have signed anything.
>
> Q.    Do you remember signing it?
>
> A.    No.
>
> Q.    Do you know –

A.      I take that back.  I do remember that it was at the conclusion of the interviews but I never read it, it was never explained to me.  He simply had his pen and said, "Initial here, here, here, here, here and here, and sign here," and it was just that simple.

(*Walker* Hrng. Tr. at 57-58.)

After Petitioner's testimony, both counsel had the opportunity to make their arguments to Judge Morrow.  As Petitioner's counsel was wrapping up his argument, the following colloquy took place between defense counsel and the judge:

[Counsel]:      Now, it's obviously a question of whether you believe Detective Smith or believe him.  If you believe the defendant, the statement's involuntary.

The Court:      Certainly not the first one, is it?

[Counsel]:      No.

The Court:      I mean, there's no challenge – can't be any challenge.

[Counsel]:      No; we have not challenged the first one.

The Court:      I haven't heard anything that said that this man thought that he was in custody even so that it merited the Miranda Rights; isn't that right?

[Counsel]:      (No response)

The Court:      Based on everything that I've heard, he was free to come and go and custody is the issue as it relates to even having to give Miranda Rights.

[Counsel]:      Well, except that he asked to leave and he asked to leave three times and he was told 10 more minutes.

The Court:      No, no, no; that was at the interlude between the two statements.

[Counsel]:      Oh, no; I'm not disputing the first statement.

The Court:      No; and that's, so I mean, we don't even have to argue whether there are Miranda Rights or not, – isn't that right, both sides?

[Counsel]:      Right.

[Prosecutor]: Yes; that's correct.

(*Walker* Hrng. Tr. at 98-99.)

Judge Morrow took the matter under advisement, and four days later delivered his ruling from the bench:

> The first item that the Court had to consider was that was [sic] Mr. Young ever Mirandized because based on what he said that there was no Miranda that came prior to either one of the statements that he gave to Officer Smith. Now, it should be noted that again it is this Court's opinion that the first statement is a no-issue statement because there was an issue of – well, it wasn't even an issue – **I find that based on what I heard that he was not even in custody and so therefore there was no need to Mirandize him, even if he was or wasn't**.

(*Walker* Hrng. Tr. of 10/21/97 at 4 (emphasis added).)  The court went on to make a finding of fact that Investigator Smith did read Petitioner his *Miranda* rights prior to each of the statements given by Petitioner, contrary to Petitioner's testimony that he was never read his rights.  Judge Morrow also found that the second statement, the confession, was given voluntarily, as the officers did not engage in any conduct that rose to the level of coercion.  The motion to suppress was therefore denied.  (*Id.* at 7.)

**b.     Trial**

One week after the conclusion of the *Walker* hearing, the trial commenced.[1]  Petitioner's next-door neighbor, Brian Watson, a police officer with the Detroit Police Department, testified that on Sunday, February 9, 1997, the morning after the shootings, Petitioner rang his doorbell sometime between 9:15 and 10:00 a.m. (Trial Tr. of 10/28/97 at 37, 41).  Watson already knew what had happened the night before, as he had been contacted earlier that morning by officers who were attempting to locate Petitioner.  Petitioner entered Watson's house, sat down at the dining

---

[1]I reiterate that only witnesses whose trial testimony in some way related to Petitioner's encounter with Investigator Smith are mentioned here, as the only issue before this Court is whether Petitioner's counsel unreasonably failed to argue that Petitioner's Fourth Amendment rights were violated by Officer Smith.

12

room table, and talked for about ten or fifteen minutes.  (*Id*. at 45-46.)   Watson testified that

Petitioner stated that he had been in Chicago when he learned of the shootings, and that he had

rushed right home, taken a shower, changed his clothes, and then come straight over to Watson's

house.  (*Id*. at 44.)  Petitioner told Watson that his son was in a coma, and that he did not want him

on life support.  Watson also testified that Petitioner said he had wanted his wife to go to Chicago

with him, but that she stayed home to get her hair done.  (*Id*. at 40.)  Petitioner stated to Watson

that he had always told his wife that if she ever had a flat tire, she should just drive straight home

and not stop.  Watson characterized Petitioner's demeanor as emotional but in control.  Watson

did not get the impression that Petitioner was in a hurry to get to the hospital.  (*Id*. at 44-46.)

Sgt. Lovier testified that on the morning after the shootings, he visited the evidence  garage

where the black Toyota had been taken.  He noticed that three of the car's four tires were clean,

but that the right rear tire, which was almost completely flat, was muddy on the bottom.  (*Id*. at

112.)  Lovier stated that this indicated to him that the tire was aired up when it went off the road.

It also appeared to him that someone had taken the valve cap off, which could mean that the tire

was purposely deflated.  He asked Officer McDonald, the evidence technician, to photograph the

car, search it, and check for fingerprints.  (*Id*. at 113.)  He also asked McDonald to reinflate the flat

tire and check approximately every half hour to see if it was leaking air.

Sgt. Lovier wondered what had happened to the valve cap, and so he decided to go to the

scene of the shootings.  At that location, he observed the tire tracks leading off the road and found

the  discarded  black  valve  cap.  (*Id*. at 116.)  The sergeant testified that, although his first

impression of the scene was that it was possibly an attempted carjacking or armed robbery gone

bad, after considering that the female victim had $300.00 in cash and numerous pieces of jewelry

which were not taken, the car keys were left in the ignition, the vehicle was not ransacked, the

13

valve cap had been taken off the tire, and there was no reason for the tire to be flat other than if someone had let the air out, he concluded that the scene had been staged to look like the car had pulled over due to a flat tire. (*Id.* at 116-17.)

Sgt. Lovier testified that after visiting the scene he went back to the squad room at the homicide department where Petitioner was being interviewed by Investigator Smith. As that interview was taking place, Sgt. Lovier was in and out of the room.  At one point he took Petitioner's gun and stored it in his desk.  He also made a phone call to the evidence tech to check on the progress with testing the tire.  (*Id.* at 118.)  After the conclusion of Petitioner's initial statement, Lovier talked with Investigator Smith.  He told Smith about what he had learned from a conversation he had had that morning with Petitioner's next-door neighbor, about what he had observed at the scene, about the tire, "and how things didn't add up." (*Id.* at 119.)

During Investigator Smith's subsequent interaction with Petitioner, Sgt. Lovier was in and out of the room, and made some more phone calls.  He also began typing up a search warrant for Petitioner's house, and when he learned that Petitioner had confessed to hiding the gun he had used in the attic of his house, Sgt. Lovier added that to the search warrant affidavit. (*Id.* at 121.)  After getting the warrant signed by a judge, he met other officers at Petitioner's house to conduct the search. (*Id.* at 125.)  Lovier found the gun, a .38 caliber revolver, stuffed in a corner of Petitioner's unfinished attic.  It was in a bag that smelled like bleach, which was wrapped in some type of bumpy sponge rubber material. (*Id.* at 127.)  Sgt. Lovier testified that bleach can be used to clean away fingerprints and traces of gunpowder. (*Id.* at 129.)  Lovier also testified that he found several items of men's clothing in the washing machine, which were collected by an evidence technician. (*Id.* at 131.)

Detroit Police Sgt. Dale Johnston, a firearms expert, testified that ballistics tests showed that the bullets recovered from the black Toyota, as well as from the brain tissue of Terry Young, had been fired from the revolver which was found in Petitioner's attic.  (*Id.* at 177-78.)

Dr. Robert Johnson, the neurosurgeon who cared for Petitioner's son, testified that Petitioner arrived at the hospital at approximately 10:30 a.m. Sunday morning.  Dr. Johnson informed Petitioner that the "prognosis was extremely grim," and that it was "almost a certainty that he would not survive this injury." (Trial Tr. at 213.)  Dr. Johnson testified that Petitioner was extremely upset and asked that his son be taken off life support.  At this point, Dr. Johnson had neither suggested nor mentioned removing the boy from the ventilator, but Petitioner explained to the doctor that he just could not endure a funeral for his wife one day and then three or four days later another funeral for his son.  Petitioner also informed the doctor that his son had stated in the past, when discussing a family member in serious medical condition, that he would never want to be kept alive on life support if there was no hope.  Finally, Petitioner told the doctor that his wife and son were Jehovah Witnesses and did not believe in a lot of high-tech medical care.  (*Id.* at 215.)  At no time did the doctor see Petitioner go into his son's hospital room.

Homicide Investigator Isaiah Smith testified that Petitioner arrived at the police station around noon.  Smith met with him at his desk in the squad room, where he first read him his rights and then asked him to give an account of his whereabouts the previous night, which Petitioner did. Petitioner explained that he had been in Bolingbrook, Illinois, since Friday night, and that he did not return to Detroit until earlier that morning.  Petitioner's "statement" was written out by Officer Smith, and Petitioner reviewed and signed each page.  (Trial Tr. of 10/29/04 at 28-35.)  The statement was read to the jury.

Investigator Smith further testified that, after the completion of the initial statement, he left Petitioner seated at his desk in the squad room while he went out and spoke with another officer about the case.  Around this time, Petitioner received word from the hospital that his son had passed away.  While out of the squad room, Investigator Smith also called the hospital and spoke with Dr. Johnson.  Based on information he learned from his conversations with the doctor and the other officer, Investigator Smith went back into the squad room, re-read Petitioner his rights, and told Petitioner that he knew he was lying.  Investigator Smith testified that, after some discussion, Petitioner confessed to the shootings.  Smith wrote out the second statement, and Petitioner was given the opportunity to read it over and sign each page, which he did.  The second statement was read to the jury.  (*Id.* at 41-51.)

Petitioner's brother, Officer Mark Young, was the first witness for the defense.  He testified that when the police were unable to locate Petitioner the night of the shootings, they called him. It was approximately 1:50 a.m., and upon hearing the news, he went immediately to the hospital. (*Id.* at 126.)  After he returned home, he attempted to contact Petitioner by calling his pager as well as by leaving a message on his home answering machine.  Mark testified that Petitioner returned his call approximately five or ten minutes later, and Mark told Petitioner what had happened to his wife and son.  Mark stated that Petitioner's call came at approximately 2:20 or 2:30 a.m., and that the Caller I.D. showed that Petitioner was calling from Bolingbrook, Illinois.  (*Id.* at 130.) Petitioner told Mark that he would immediately return to Detroit.

Petitioner testified in his own defense at trial.  He stated that he was in Illinois when the shootings occurred, and that when he arrived back in Detroit on Sunday morning he first went home, then to his next-door neighbor's house to see if he had any information, then to his parents' house, then to his in-laws' house, and then to the hospital.  (*Id.* at 250-53.)  He stated that he never

went into his son's hospital room because he just couldn't bear to see him with those injuries. (*Id.*
at 257.)  From the hospital, Petitioner drove to the homicide section at police headquarters.  He
testified that he never confessed to anything, and that he never read what was written on the papers
typed up by Investigator Smith before signing them.  Petitioner explained that he was so upset
about the loss of his wife and son, and so tired of dealing with Investigator Smith, that when Smith
pointed to certain places on the papers and told Petitioner to sign them, he did as he was told. (Trial
Tr. of 10/30/97 at 18-19.)

Following the five-day trial, the jury found Petitioner guilty as charged.

### c.     Direct Appeal

On direct appeal, in addition to the arguments presented by Petitioner's appellate counsel,
Petitioner filed a *pro se* brief raising the claim of illegal detention at the time of his confession.
The Michigan Court of Appeals affirmed Petitioner's convictions.  The court held as follows with
regard to the claims concerning his trial counsel's performance and the admission into evidence
of his confession:

> First, there is no merit to defendant's claim that the trial court erred by
> denying his motion to suppress his confession.  Defendant's claim that he was not
> given his *Miranda* rights is not relevant to this issue; **defendant was not in custody
> at the time of his first statement**, *People v. Honeyman*, 215 Mich. App 687,
> 694-695; 547 NW2d 344 (1996), and he denies that he ever made the second
> statement.  In determining whether a defendant's statement was voluntary, a court
> should consider (1) the age of the accused; (2) the accused's lack of education or his
> intelligence level; (3) the extent of the accused's previous experience with the
> police; (4) the repeated and prolonged nature of the questioning; (5) the length of the
> detention before the accused gave the statement; (6) the lack of any advice to the
> accused of his constitutional rights; (7) whether there was an unnecessary delay in
> bringing the accused before a magistrate before he gave the confession; (8) whether
> the accused was injured, intoxicated or drugged, or in ill health when he gave the
> statement; (9) whether the accused was deprived of food, sleep or medical attention;
> (10) whether the accused was physically abused; and (11) whether the accused was
> threatened with abuse.  *People v. Sexton*, 458 Mich. 43; 580 NW2d 404 (1998).
> Here, defendant had a high school education; **he came to the police station**

**voluntarily**, **at a time of his own choosing**; **he was at the police station less than 3-1/2 hours when he made his confession**; he denied being intoxicated or drugged and did not appear to be; he was offered food; and he does not claim to have been physically abused or threatened.  Defendant's claims of error rest entirely on a finding of credibility.  **The trial court did not believe defendant's allegations** and this Court gives great deference to the trial court's assessment of credibility.  *People v. Cheaham*, 453 Mich. 1, 29- 30; 551 NW2d 355 (1996); *People v. Kowalski*, 230 Mich App 464, 471-472; 584 NW2d 613 (1998).  The trial court's findings and conclusion that defendant's confession was voluntary are not clearly erroneous.  *Id*.

. . . .

There is no merit to defendant's claim *in propria persona* **that the police lacked probable cause to conduct a custodial interrogation.**  An arrest must be made upon probable cause at the time of the arrest.  *People v. Lyon*, 227 Mich App 599, 611; 577 NW2d 124 (1998).  Probable cause is established by showing the probability or substantial chance of criminal activity.  *Id*.  Even if a suspect is detained illegally, his subsequent confession need not be suppressed unless the unlawful detention was used to directly procure evidence from the detainee.  *People v. Kelly*, 231 Mich App 627, 634; 588 NW2d 480 (1998).  Intervening circumstances, such as new information learned by the police, can break the causal connection between an unlawful arrest and an inculpatory statement, so that the statement is sufficiently an act of free will to purge the primary taint of unlawful arrest.  *Id*.  **Here, there was ample evidence of defendant's involvement in the shootings to justify his custodial interrogation prior to his making a confession. There was no plain error in admission of his statement, *Carines, supra*, and defendant's claim of ineffective assistance on this basis is also without merit.**

*People v. Young*, No. 208788, 2000 WL 33521874, *1 - *2 (Mich. Ct. App. March 14, 2000)

(unpublished) (emphasis added).

Petitioner's application for leave to appeal was denied by the Michigan Supreme Court.

(Rule 5 Mat., *People v. Young*, No. 116925 (Mich. Oct. 30, 2000).)

**3.      Analysis & Conclusions**

**a.      Ineffective Assistance of Trial Counsel**

As previously stated, a writ of habeas corpus may only be issued if the state court's adjudication of a claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  28 U.S.C. §

18

2254(d)(1).   The Supreme Court's clearly established law governing claims of ineffective

assistance of counsel was set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80

L. Ed. 2d 674 (1984).   When a claim of ineffectiveness is based upon a trial attorney's failure to

recognize and pursue a Fourth Amendment claim, however, the Court has explained that the

*Strickland* test is somewhat modified:

> The essence of an ineffective-assistance claim is that counsel's unprofessional errors
> so upset the adversarial balance between defense and prosecution that the trial was
> rendered unfair and the verdict rendered suspect.   *See, e.g., Strickland v.
> Washington*, 466 U.S., at 686, 104 S. Ct., at 2064; *United States v. Cronic*, 466 U.S.
> 648, 655-657, 104 S. Ct. 2039, 2044-2046, 80 L. Ed. 2d 657 (1984).   In order to
> prevail, the defendant must show both that counsel's representation fell below an
> objective standard of reasonableness, *Strickland*, 466 U.S., at 688, 104 S. Ct., at
> 2064, and that there exists a reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding would have been different.   *Id.*,
> at 694, 104 S. Ct., at 2068.   Where defense counsel's failure to litigate a Fourth
> Amendment claim competently is the principal allegation of ineffectiveness, the
> defendant must also prove that his Fourth Amendment claim is meritorious and that
> there is a reasonable probability that the verdict would have been different absent
> the excludable evidence in order to demonstrate actual prejudice.   Thus, while
> respondent's defaulted Fourth Amendment claim is one element of proof of his Sixth
> Amendment claim, the two claims have separate identities and reflect different
> constitutional values.

*Kimmelman v. Morrison*, 477 U.S. 365, 374-75, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986).

In response to the concern that, after *Kimmelman*, every habeas petitioner with a Fourth

Amendment claim that is barred from habeas review by *Stone v. Powell*, 428 U.S. 465, 96 S. Ct.

3037, 49 L. Ed.2d 1067 (1976), will be able to circumvent *Stone* and bring the claim under the

guise of a Sixth Amendment ineffective-assistance-of-counsel claim, the Court explained that

*Strickland*'s demanding standard for proving attorney incompetence would prevent the holding of

*Kimmelman* from swallowing up the rule of *Stone*:

> Although a meritorious Fourth Amendment issue is necessary to the success of a
> Sixth Amendment claim like [defendant Morrison's], a good Fourth Amendment
> claim alone will not earn a prisoner federal habeas relief.   Only those habeas

> petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial without the challenged evidence.

*Kimmelman*, 477 U.S. at 382.  The Court reiterated that, pursuant to *Strickland,* there is a "strong presumption of attorney competence," *id.* at 383, and that a habeas court must utilize a "highly deferential" standard of review when determining whether a petitioner has overcome that presumption.  *Id.* at 381.  To rebut the presumption, a petitioner must "prov[e] that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy."  *Id.* at 384 (citing *Strickland*, 466 U.S. at 688-689).  In the *Kimmelman* case, the Court concluded that trial counsel's complete failure to conduct pretrial discovery or to bring a timely pre-trial suppression motion was unreasonable in light of prevailing professional norms, and therefore it remanded the case for a determination from the lower court on the issue of prejudice.  *Id.* at 390-91.

In this case, then, pursuant to *Kimmelman*, Petitioner Young bears the burden of establishing:  (1) that his trial counsel's representation fell so far below an objective standard of reasonableness so that he was denied a fair trial by counsel's gross incompetence; (2) that his Fourth Amendment claim is meritorious; and (3) that there is a reasonable probability that the verdict would have been different absent the excludable evidence.  *Id.* at 374-75.  Petitioner also bears the burden of presenting clear and convincing evidence to rebut the state courts' finding that Petitioner's testimony regarding the circumstances surrounding the confession was not credible, as this finding falls within the category of issues to which the presumption of correctness applies. *See* 28 U.S.C. § 2254(e)(1); *Miller v. Fenton*, 474 U.S. 104, 112, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985).  Moreover, the state courts' finding that Petitioner was not in custody until after the interlude between the two statements is also entitled to "great weight."  *Miller*, 474 U.S. at 112.

20

At the evidentiary hearing held by this Court, Petitioner's habeas counsel presented the testimony of Petitioner's trial counsel, James O'Connell. (Evid. Hrng. Tr., Dkt. 48.)  Mr. O'Connell is now retired and living in Florida, although he stated that he still occasionally practices law.  (*Id.* at 78.)  He testified that he doesn't remember many specifics from the Young case.  (*Id.* at 81.)  He recalls that he was retained, and that Petitioner Young never indicated any displeasure with him or filed a grievance against him.  He testified that he didn't remember the *Walker* hearing until he talked to the policeman in the hall and it jogged his memory as to there being a hearing on the voluntariness of Petitioner's confession.  (*Id.* at 89.)  However, he has no recollection of whether he ever considered arguing that the confession was inadmissible as the fruit of an illegal detention, nor does he remember whether Petitioner suggested that he make such an argument.

Petitioner's habeas counsel argues that O'Connell's testimony clearly failed to establish that a strategic decision was made to not challenge the confession on the basis of illegal arrest.  (Post-Hrng. Br., Dkt. 51 at 22.)  Rather, counsel asserts that O'Connell was simply derelict in not raising the issue, and that such dereliction deprived Petitioner of his Sixth Amendment right to the effective assistance of counsel because it was unreasonable.

Counsel for Respondent concedes that there is no evidence to suggest that attorney O'Connell made a strategic decision to not challenge the confession on the grounds of illegal arrest.  (Resp.'s Br., Dkt. 50 at 23.)  However, Respondent points out that the key inquiry here is whether Petitioner's claim of illegal arrest has merit, because if the answer to that question is no, then O'Connell's failure to raise the unmeritorious issue certainly did not render his performance grossly incompetent, and Petitioner is not entitled to habeas relief.

**b.      Merits of the Fourth Amendment Claim**

It has long been the law that the Fourth Amendment requires that formal arrests be supported by probable cause. *Draper v. United States*, 358 U.S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959). However, the Supreme Court has held that, even in the absence of what would be considered a formal arrest, police conduct that sufficiently restrains a person's liberty can constitute a seizure that is, in effect, the equivalent of an arrest, and therefore must also be justified by probable cause. *Davis v. Mississippi*, 394 U.S. 721, 89 S. Ct. 1394, 22 L. Ed. 2d 676 (1969). In *Davis*, the Court ruled that an "investigative detention" at a police station for the purposes of fingerprinting a suspect, where the police had neither probable cause to arrest nor judicial authorization, was a violation of the Fourth Amendment. The rule from *Davis* was reaffirmed in the subsequent case of *Dunaway v. New York*, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979), where the Court held that when the police remove a suspect from a private home and transport him to the police station for any investigative purpose, be it fingerprinting or interrogation, they must have probable cause, judicial authorization, or the consent of the suspect. *See also Hayes v. Florida*, 470 U.S. 811, 815-16, 105 S. Ct. 1643, 84 L. Ed. 2d 705 (1985).

The test for determining the point at which a seizure of a person occurs has also been clearly established by the Supreme Court: "[A]n initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 215, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)).

22

In this case, Petitioner contends that he was arrested without probable cause soon after he arrived at the police station.  He claims that this conclusion is evidenced by four undisputed facts: (1) he was read his *Miranda* rights by Investigator Smith at the beginning of their encounter; (2) the gun he was carrying was "confiscated"; (3) Smith told Petitioner that he "would not walk out of there"; and (4) near the close of Petitioner's first statement, Smith asked Petitioner how long he had been in police "custody," and Petitioner responded, "since 12:20 this afternoon."  (Pet'r's Post-Hrng. Mem., Dkt. 51 at 3.)

Counsel for Respondent counters that, with regard to the time period encompassing the entire first statement, a reasonable person whose wife and son had just been shot and whose wife had died would expect to be asked to come to the police station and to be asked questions that could assist in the investigation.  Such a reasonable person would not automatically assume they were a suspect merely because they found themselves at that location answering those types of questions.  Respondent asserts that Petitioner was not "under arrest" or "in custody" during the time he was giving what has become known as the "first statement," but rather that the "arrest" occurred at the subsequent point when Investigator Smith returned to the squad room after learning additional information about the shootings, confronted Petitioner with his belief that Petitioner was lying, and made the statement that Petitioner would "not walk out of there because the statement he gave [before] was bullshit."  (Dkt. 50 at 43-46.)

I suggest that Respondent's position has merit.  A reasonable person in Petitioner's situation, whose immediate family members had hours before been brutally attacked, and who could not be located by the police for some time after the attacks, would not have been surprised to be asked by police to come to the police station when he arrived back in town and to give an account for his whereabouts at the time of the attacks.  I further suggest that any citizen, whether

23

a fireman or not, would not find it unusual for a police officer to ask to hold the citizen's gun while

he is in the police station.  Moreover, the fact that Investigator Smith read Petitioner his *Miranda*

rights before asking him to explain where he was at the time of the shootings did not transform

their encounter into an arrest:

> Resort to physical restraint is almost certain to result in a holding that an arrest had
> been made, while the lack of such restraint is a consideration pointing toward
> consent.  But the situation can amount to an arrest even though there were no formal
> words of arrest and no booking.  On the other hand, the issuance of *Miranda*
> warnings as a cautionary measure does not itself transform the situation into a
> Fourth Amendment seizure.

3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 5.1(a)

(West 2004).  Professor LaFave further explains that

> [v]arious circumstances can contribute to the conclusion that the defendant's
> presence at a police facility or in a police environment was voluntary.  Included are
> that the suspect appeared at the station without there being any prior police request
> that he do so, that he actually volunteered to appear when he learned the police were
> interested in speaking with him, that he appeared following a request from the police
> which reached him via a third party, that he determined the time and place of the
> police contact, that he transported himself to the police facility, or that he actually
> stated he did not view the encounter as an arrest.

*Id.*  Applying these additional factors to this case, it is clear that Petitioner voluntarily consented

to the questioning which occurred during the first statement.  It is undisputed that after Petitioner

learned that police were interested in speaking with him, he drove himself to the police station at

a time of his own choosing.  Moreover, in this case Petitioner himself testified during the state

court proceedings that he did not view the encounter as an arrest.  As previously quoted, Petitioner

stated that Investigator Smith was "the perfect gentleman" during the entire first interview (*Walker*

Hrng. of 10/17/97 at 59), and that he (Petitioner) thought he was just going to be able to walk out

of there after they were done with the interview.  (*Id.* at 66.)  Thus, even though he had been asked

to allow Sgt. Lovier to hold onto his gun for safety's sake while he was in the squad room,

24

Petitioner still felt free to leave, by his own admission. Therefore, as the Michigan trial and appellate courts concluded, I suggest that Petitioner was not under arrest or in custody from the time he voluntarily arrived at the police station through the conclusion of his initial exculpatory statement to Investigator Smith.

I further suggest that Petitioner was not "arrested" during the period between the statements when he asked Investigator Smith if he could leave because he had an appointment, and Smith told him it would be just another ten minutes. *See Mendenhall, supra,* (consent to search was not negated by defendant's pre-search statement to officer that she needed to leave because she had a plane to catch).

I also suggest that, as Respondent asserts, Petitioner was "arrested" at the moment when Investigator Smith returned to the squad room, sat on top of his desk, and confronted Petitioner with the fact that the officers did not believe his story. A reasonable person in this situation would, I suggest, no longer feel free to leave once a detective indicates his belief that the person has committed two murders. The question then becomes whether there was probable cause to arrest at this point in time.

Probable cause exists where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. *Carroll v. United States*, 267 U.S. 132, 162, 45 S. Ct. 280, 69 L. Ed. 543 (1925). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949). Probable cause must be evaluated based on "an examination of

all facts and circumstances within an officer's knowledge at the time of an arrest." *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999).

In this case, before Petitioner even arrived at the police station, Investigator Smith was aware of facts indicating that this incident was not motivated by robbery – he knew that victim Terry Young's purse was found open on the front seat of the car with hundreds of dollars of cash visible in it, and that the keys to the Toyota were found in the ignition.  (Evid. Hrng. at 40.) Investigator Smith also had spoken to one of Terry Young's best friends, who told Smith that Terry had confided in her that Terry and Petitioner had not been intimate in over a year (*id.* at 46-47) and that Terry suspected that Petitioner had a girlfriend.  (*Id.* at 51.)

Petitioner arrived at the police station, and began to explain his whereabouts the prior evening.  Sometime during Petitioner's first statement, Sgt. Lovier arrived at the station and privately relayed to Investigator Smith what he had just learned regarding the scene of the crime, the valve cap being removed from the tire and found on the ground, and his theory about the tire being purposely deflated.  (Evid. Hrng. at 66, 71.)  Smith did not reveal any of this information to Petitioner but continued taking the first statement.  In that statement, Petitioner told Smith that he (Petitioner) learned of the shootings when he woke up at 3:00 a.m. in a Bolingbrook, Illinois, hotel room and decided to call home and check his voicemail.  Petitioner also told Smith that, after he learned of his wife's death and his son's condition from his brother, he called a work colleague, who put him on the three-way call with another colleague, and then after that conversation he drove back to Detroit from Illinois and went directly to the hospital.  (See First Statement, quoted above.)

During the break after the first statement, Investigator Smith gained information that directly conflicted with Petitioner's statement when Sgt. Lovier told Smith about his conversation

with Petitioner's next-door neighbor, who stated that Petitioner had been home that morning. Smith thus learned that Petitioner had not driven straight to the hospital, as he had stated, but had gone home, changed his clothes, and then gone next door to his neighbor's house where he sat down at the dining room table and talked for fifteen or twenty minutes.  (Trial Tr. of 10/28/97 at 119; Evid. Hrng. at 102-03.)

Investigator Smith also spoke with Dr. Johnson at the hospital and learned that when Petitioner arrived at the hospital, he immediately asked that his son be removed from life support. (Evid. Hrng. at 48-49.)  Dr. Johnson told Smith that this was unusual, because most family members wait a number of hours to see if the patient is going to improve or show any brain activity before they reach the point of considering such a decision.  (*Id*. at 49.)

Armed with all of this information, Investigator Smith determined that he had probable cause to arrest Petitioner and confronted Petitioner with his belief in Petitioner's guilt.  Smith stated that, had Petitioner attempted to leave at this point, he would not have allowed him to do so. Investigator Smith's subjective belief that he had probable cause for arrest, however, is not determinative of the issue, as the test is an objective one.  *United States v. Anderson*, 923 F.2d 450, 456 (6th Cir. 1991) ("The test for the existence of probable cause is wholly objective.").  Applying an objective test to the pieces of information possessed by Investigator Smith, I suggest that the Michigan appellate court was correct in holding that they were adequate to support probable cause. Smith did not have merely a suspicion at that point.  As he has articulated several times, he was aware of facts from which a reasonable officer could infer a probability that Petitioner was involved in the illegality that occurred, not the least of which was that he had caught Petitioner in a lie.  Further, while some of the "facts" were merely what could be termed unusual circumstances, such as Petitioner's statement that he just happened to call home to get his messages at 3:00 in the

morning, or his behavior at the hospital, "[t]he more unusual the occurrences are that the police are able to confirm, the stronger the showing of probable cause, and vice versa." *United States v. Strickland*, 144 F.3d 412, 417 (6th Cir. 1998). Certainly Smith did not possess evidence at that point that could have proven Petitioner guilty beyond a reasonable doubt, but the threshold for probable cause is not that high. *Id.* at 415-16. *See also Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) ("Probable cause requires only the probability of criminal activity not some type of 'prima facie' showing."). Therefore, I suggest that the Michigan appellate court's conclusion that the police had probable cause to arrest Petitioner prior to the confession was not contrary to, nor did it involve an unreasonable application of, Supreme Court precedent.

### c.      Conclusion

Accordingly, I suggest that Petitioner has failed to rebut the "strong presumption of attorney competence" by showing "a reasonable probability" that, if trial counsel had challenged the confession on the additional grounds of illegal arrest, "the result of the proceeding would have been different." *Kimmelman*, 477 U.S. at 375, 383. Thus, the State of Michigan's rejection of Petitioner's claim of ineffective assistance of counsel on this basis was not contrary to Supreme Court precedent, and the petition for writ of habeas corpus should be denied.

### III.   REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties

2:01-cv-10094-DML   Doc # 53   Filed 11/18/04   Pg 29 of 29   Pg ID 240

are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

 s/ *Charles E. Binder*

CHARLES E. BINDER
United States Magistrate Judge

Dated: November 18, 2004

## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on David A. Koelzer, and served on Thomas M. Chambers and Brenda E. Turner in the traditional manner.

Dated: November 18, 2004                    By    s/Jean L. Broucek
                                             Case Manager to Magistrate Judge Binder